UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **DANIEL WONG,**<br>Plaintiff,<br>vs.<br>**WELLS FARGO BANK, N.A.,**<br>Defendant. | CASE NO. 20-CV-00249-YGR<br>**ORDER GRANTING MOTION FOR SUMMARY JUDGMENT AND DENYING MOTION FOR CONTINUANCE AS MOOT**<br>Re: Dkt. Nos. 42, 45 |

Plaintiff, proceeding pro se, filed this employment action on December 11, 2019, in San Francisco Superior Court, bringing claims for wrongful termination, discrimination, retaliation, defamation, and intentional infliction of emotional distress. Currently pending are plaintiff's motion for a continuance of all case-related dates and defendant's motion for summary judgment. After the case was removed, the Court held an initial case management conference on July 27, 2020, setting the fact discovery deadline for January 29, 2021. On March 26, 2021, defendant moved for summary judgment on all claims.

Having carefully considered the parties' submissions as well as the oral arguments advanced at the May 4, 2021 hearing, the Court **GRANTS** the motion for summary judgment and **DENIES AS MOOT** the motion for continuance.

**I. BACKGROUND**

In January 2016, defendant Wells Fargo Bank, N.A., hired plaintiff Daniel Wong as an analytic consultant within the bank's Enterprise Regulatory and Basel Reporting ("ERBR") Group. (Deposition of Daniel Wong ("Pl. Dep."), Dkt. No. 50, 48:20–25, 55:21–56:4, 58:13–24.) Plaintiff was 54 years old at the time. (*Id.* at 56:23–57:3.) Plaintiff was responsible for tracking and managing data quality issues. (*Id.* at 58:6–12.) Plaintiff "possess[es] over 20 years [of] experience in various analytical roles" and "hold[s] Masters of Science degrees in Industrial

Administration and Computer Engineering . . . and a Chartered Financial Analyst certification." (Declaration of Daniel Wong ("Pl. Decl."), Dkt. No. 48 at 21, ¶ 4.) With respect to his work performance, "[a]lthough severely resource constrained and handicapped, [plaintiff] still managed to complete the tasks at hand – albeit with some deficiencies – with continuous strides toward efficiency and improvement. Nowhere in [his] performance evaluation accounts for these facts. However, as a testament to [his] contributions, [plaintiff] was awarded a merit increase and was also paid [his] targeted bonus for [his] efforts." (*Id.* ¶ 2.)

Plaintiff initially reported to Sunil Padture for a few months before reporting to his second-level manager, Sean Stone, through the end of 2016 and into early 2017. (Pl. Dep. 56:16–18, 59:21–60:17.) Stone oversaw the ERBR Group's Data and Collection Management Team, which housed the Data Issues Management Team on which plaintiff worked. (Declaration of Diana Aquino ("Aquino Decl."), Dkt. No. 45-3, ¶ 3.) In early 2017, plaintiff reported to Prabalika Goswami, who took over leadership of the Data Issues Management Team. (Pl. Dep. 67:14–21, 68:10–12.) Thus, plaintiff reported to Goswami, who was overseen by Stone.

Plaintiff alleges in the complaint that he had "reluctantly accepted" his assignment to Goswami's supervision "despite Ms. Sheng Wang, a former direct report of Ms. Goswami, ha[ving] negative experiences with this manager, including bullying, constant belittling, threatening comments, and isolation. Ms. Wang, with the aid of senior management, was transferred to another area within regulatory reporting not managed by Ms. Goswami upon her complaint. The Plaintiff observed these facts by his close working proximity to Ms. Wang." (Complaint, Dkt. No. 1-1, ¶ 11.) Plaintiff testified that his allegations regarding Goswami's negative treatment of Wang are based on "just the chatter that [he] hear[s] in the department, the gossip, as well as, . . . [his] observations when [he is] in a meeting . . . ." (Pl. Dep. 69:21–70:8.) While Wang "never told [him] in words" about the alleged negative treatment," he "could see her expression," such as "shaking her head" or "making a face in disgust . . . when she thought no one else was looking." (*Id.* at 72:11–73:13, 146:20–25.)

Wang avers that she "did not work on the same projects as Mr. Wong and [ ] had little interaction with him, but [they] attended some of the same meetings and his cubicle was on the

2

same floor as [hers]." (Declaration of Sheng Wang, Dkt. No. 45-4, ¶ 2.)  Wang further stated that "[d]uring the time [she] worked with Ms. Goswami, [she] had a good working relationship with her.  Ms Goswami treated [her] well.  [Wang] never raised any concerns about Ms. Goswami to anyone at [Well Fargo] and [she] did not discuss Ms. Goswami with Mr. Wong.  [Wang] never felt that Ms. Goswami treated [her] negatively or retaliated against [her]." (*Id.* ¶ 4.)  Plaintiff does not dispute Wang's testimony. (Plaintiff Response to Defendant Issue 6, Facts 5 and 6, Dkt. No. 49 ("Fact not in dispute.  Ms. Wang's statement is a matter of an opinion from an active employee and needs to be regarded as such.").)

Around the time Goswami took over the Data Issues Management Team, plaintiff applied for a higher-level analytic consultant position on the team (Job Requisition No. 5322169). (Declaration of Melissa Henry ("Henry Decl."), Dkt. No. 45-5, ¶ 3.)[1]  Recruiter Melissa Henry avers that 31 candidates applied for the opening.  (*Id.*) "Upon reviewing the background and qualifications of the 31 applicants, [Henry] determined the four best qualified candidates for a screening interview.  Mr. Wong was not one of those four candidates as his application materials evidenced little background and experience in the area of regulatory risk at a financial services company, which was a key requirement for the open role, whereas other applicants' materials evidenced significantly more such experience." (*Id.*.; Plaintiff's Resp. to Defendant's Issue 2, Fact 3, Dkt. No. 49 ("Fact undisputed.  This is the opinion of an active employee. . . .").)  Henry states that she did not know the ages of the applicants, including that of plaintiff. (Henry Decl. ¶ 3; Pl. Resp. to Def. Issue 2, Fact 4 ("Fact undisputed.").)  Simon Kember, an apparently younger candidate, was hired for the opening.[2]

---

[1] Neither party indicates when in 2017 plaintiff applied for this opening.  However, plaintiff alleges in his complaint that he applied for the analytic consultant position "[i]n the spring of 2017, about the time of [his] involuntary transfer to Ms[.] Goswami's supervision." (Compl. ¶ 13.)

[2] Neither party provides proof of Simon Kember's apparent or actual age.  However, plaintiff alleges in his complaint that "[t]o the best of [his] knowledge[,] Mr. Kember was below 40 years of age at the time." (Compl. ¶ 14.)  Further, plaintiff testified that he does not believe that Kember was in an age-protected category "[b]ased on his LinkedIn profile." (Pl. Depo. 160:1–5.)

3

On August 1, 2017, plaintiff "had a phone conversation with [Stone] complaining about [Goswami's] biased and unfair treatment (discriminatory) and isolation (harassment)" directed toward plaintiff. (Pl. Decl. ¶ 7.) Plaintiff testified that he told Stone: "I felt that I wasn't fairly treated, I was isolated in the department. I felt that basically there were like two DIIRFs [Data Issues Identification and Remediation Framework] – DIIRF teams, a legacy DIIRF and then the DIIRF that Ms. Goswami was running." (Pl. Dep. 187:20–188:1.) "I told him that I wasn't happy. . . . I wasn't getting what I needed to get – get the job done. . . . [B]asically I was being isolated from, you know, any kind of information that really matters in terms of me doing my job well. I told . . . him that I felt that I wasn't being treated fairly by Ms. Goswami[.] . . ." (*Id.* at 188:15–22.) "Fearing retaliation, [plaintiff] asked Mr. Stone to keep [their] conversation private, but Mr. Stone replied that he needed to speak with Ms[.] Goswami since she was [plaintiff's] supervisor." (*Id.*)

Meanwhile, plaintiff learned from LinkedIn that on September 15, 2017, defendant hired Sujit Nimbalker, an H1-B visa holder, "as an analytical consultant in an identical functional role" as him. (Pl. Decl. ¶ 6.)[3] Plaintiff did not apply for the position. (Pl. Resp. to Def. Issue 4, Fact 2 ("Fact not in dispute.").) One month later, on October 17, Stone notified plaintiff that his position had been eliminated and that he would be displaced in 60 days if he did not find another internal or external position. (Pl. Dep. 105:18–106:17.)

Plaintiff does not dispute that around June 2017, the ERBR Group "started a re-organization process to effect cost savings in large part by relocating offshore certain of its repetitive, transactional activities and eliminating domestic positions that primarily performed such activities. [Seventeen] positions ultimately were eliminated in the ERBR Group." (Aquino Decl. ¶ 2; Pl. Resp. to Def. Issue 6, Fact 2 ("Fact not in dispute.").) The business case reorganization or reduction in force was initiated on August 16, 2017, and approved on September 5, 2017. (Aquino Decl., Ex. A.) At this time, the Data Issues Management Team had four members, including plaintiff, all of whom were analytic consultants. (*Id.* ¶ 5.) As they

---

[3] Neither party cites a job requisition number in connection with the position filled by Nimbalker.

"performed the same general functions, . . . in the go-forward structure, there were to be three" analytic consultants. (*Id.*) "[T]o determine which three of the four existing four team members would remain in the go-forward positions reporting to Ms. Goswami," team members were rated on the following job competencies: "(1) attention to detail, (2) achievement/effort, (3) decision making, (4) dependability, and (5) developing and maintaining relationships." (*Id.* ¶ 6.)

"[T]he two raters, Mr. Stone and Ms. Goswami, independently rated each team member on each of those competencies on a scale of 1 (lowest) to 5 (highest). Mr. Stone's average rating across the five competencies for Mr. Wong was 2, and was lowest of the four team members. Ms. Goswami's average rating across the five competencies for Mr. Wong also was 2, and also was lowest of the four team members. Mr. Wong's overall average rating was 2, while the other three team members' overall average ratings were 3.9, 4.3., and 4.5. The five competencies were weighted 16% each for a total of 80% of the team members' final rating. The other 20% was based on their length of employment at [Wells Fargo Bank]. As Mr. Wong had the lowest final rating, his position was eliminated." (*Id.*) These facts are "not in dispute," but "[t]he ratings failed to account for severely constrained resources as well as subsequent bonus payment to [him] as a testimony of his contributions to his employer." (Pl. Resp. to Def. Issue 6, Fact 3.) The parties do not indicate when the ratings process occurred, although the record suggests that it occurred at some point between September 5 (after approval) and October 17 (when plaintiff was notified of the displacement). (Aquino Decl., Ex. A; Pl. Dep. 105:18–106:17.)

"[D]uring the September to November 2017 time frame," plaintiff applied for an operational consultant position (Job Requisition No. 5355624). (Pl. Decl. ¶ 5.) Plaintiff avers that he "fully met the qualification[s] for the role and was a strong candidate" because he had worked alongside Devaiah Appachetlanda, who previously held the position. (*Id.*) After plaintiff interviewed for the position, recruiter Harold Harkinson called him. (*Id.*) Allegedly, Harkinson said he "was highly positive regarding [plaintiff's] prospect[s] for this position" and that they "would like to wrap this thing up as soon as possible and get an offer out to you[.]" (*Id.*) This conversation occurred the week before the Thanksgiving holiday. (*Id.*) After speaking with Harkinson, plaintiff spoke with department head Kamal Panda. (*Id.*) "There was nothing special

5

about the conversation." (*Id.*)  In the end, plaintiff "neither received an offer nor a rejection." (*Id.*)

Ultimately, plaintiff did not find another position before his employment ended 60 days later in mid-December 2017.  (Pl. Dep. 29:12–22.)  Because he was displaced, defendant offered plaintiff salary continuation benefits for two additional months in exchanging for signing a release agreement.  (*Id.* at 108:16–109:1.)  Plaintiff declined to sign the release agreement.  (*Id.*)[4]

## II. REQUEST TO DEFER OR DENY MOTION FOR SUMMARY JUDGMENT TO ALLOW DISCOVERY

As an initial matter, the Court notes that in opposing the motion for summary judgment, plaintiff asserts that "[d]efendant has obstructed [his] attempt for discovery by failing to produce salient documents requested." (Opposition, Dkt. No. 48, at 4.)  The Court construes this as a request for to defer ruling or deny summary judgment under Federal Rule of Civil Procedure 56(d), which provides:

> If a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition [to a motion for summary judgment], the court may: (1) defer considering the motion or deny it; (2) allow time to obtain affidavits or declarations or to take discovery; or (3) issue any other appropriate order.

Fed. R. Civ. P. 56(d).

A party requesting relief pursuant to Rule 56(d) "must identify by affidavit the specific facts that further discovery would reveal, and explain why those facts would preclude summary judgment." *Tatum v. City and County of San Francisco*, 441 F.3d 1090, 1100 (9th Cir. 2006); *see also VISA Int'l Serv. Ass'n v. Bankcard Holders of Am.*, 784 F.2d 1472, 1475 (9th Cir. 1986) ("[T]he denial of a [Rule 56(d)] application is generally disfavored where the party opposing summary judgment makes (a) a timely application which (b) specifically identifies (c) relevant information, (d) where there is some basis for believing that the information sought actually

---

[4] This recitation of facts contains hearsay statements proffered by plaintiff that are not critical to the Court's analysis.  That said, defendant did not raise any hearsay objections in its motion for summary judgment.  *See Skillsky v. Lucky Stores, Inc.*, 893 F.2d 1088, 1094 (9th Cir. 1990) ("For purposes of summary judgment, the court had to consider [certain] testimony, even if it was hearsay, because [the defendant] failed to object.").

6

exists."). Moreover, the party seeking a Rule 56(d) continuance must demonstrate that he diligently pursued discovery. *See Pfingston v. Ronan Eng'g Co.*, 284 F.3d 999, 1005 (9th Cir. 2002) ("The failure to conduct discovery diligently is grounds for the denial of a Rule 56(f) motion."); *Mackey v. Pioneer Nat'l Bank*, 867 F.2d 520, 524 (9th Cir. 1989) ("A movant cannot complain if it fails diligently to pursue discovery before summary judgment.").

Plaintiff avers that on January 15, 2021, he served defendant with a set of discovery requests for production of documents. (Pl. Decl. ¶ 1; Ex. 1 (Plaintiff's First Request for Production of Documents ("Pl. RPD")).) This includes requests for documents pertaining to the analytic consultant job opening and the operational consultant job opening, documents generated or received by Goswami and Stone in which plaintiff was referenced, and the personnel files of Sheng Wang, Simon Kember, and Sujit Nimbalker. (Pl. RPDs 3–10.) According to plaintiff, defendant only produced the Wells Fargo Employee Handbook, a copy of his performance review, and a copy of his displacement notice "but none of the documents requested." (Pl. Decl. ¶ 1.) "This was followed with a document from the Defendant claiming attorney / client privilege, burdensome nature for production, and the [un]timeliness of the request." (*Id.*) Plaintiff requested a meeting with defense counsel to address the purported deficiency, but plaintiff maintains that counsel did not respond at the time. (*Id.*; Exs. 2 and 3.) Plaintiff therefore submits that many of the facts in the pending motion for summary judgment are "one sided and incomplete" as a result of defendant's "withholding [of] salient facts." (Opp. at 6.)

Defendant contends that plaintiff had ample opportunity to conduct discovery, noting that plaintiff did not conduct any discovery during the approximately six months between the initial case management conference held on July 27, 2020, and January 15, 2021, when he served his first set of document requests on defendant. (Reply, Dkt. No. 51, at 3.) In addition, defendant argues, plaintiff "fails to provide any explanation for how the evidence he claims he is missing will suffice to defeat the pending Motion, contrary to Rule 56(d)'s requirements." (*Id.*)

First, the Court finds that plaintiff provides no reason for his delay. Although plaintiff separately moved for a continuance of all case-related deadlines on March 12, 2021, prior to the filing of defendant's motion for summary judgment, that request was made because his laptop was

7

stolen from his car on January 17, 2021, and because "during this period of Covid-19, resources available to the pro per litigant are additionally constrained." (Dkt. No. 42 at 2.) These circumstances, while unfortunate, do not explain why he delayed in serving his discovery requests. Indeed, the motion itself does not alert the Court that discovery was not complete. Plaintiff only raised the need for additional discovery in his opposition to the motion for summary judgment, suggesting that plaintiff "neglected to obtain the discovery before the discovery deadline, and is belatedly attempting to remedy that problem." *Carbajal v. St. Anthony Central Hospital*, No. 12-CV-2257 (REB) (KLM), 2014 WL 7146185, at *3 (D. Colo. Dec. 15, 2014). While the Court is mindful that the requested information is in the exclusive control of defendant, Rule 56(d) is "not intended to permit late discovery simply because a party failed to determine that he needed certain evidence to oppose a motion for summary judgment, or failed to[ ]timely file a motion to compel related to previously-received discovery responses." *Id.*; *see also Burlington N. Santa Fe R. Co. v. Assiniboine & Sioux Tribes of Fort Peck Reservation*, 323 F.3d 767, 773–74 (9th Cir. 2003) (lack of diligence in discovery supports denial of request to continue summary judgment); *Qualls v. Blue Cross of Cal., Inc.*, 22 F.3d 839, 844 (9th Cir. 1994) (party seeking Rule 56(d) delay must show that it "diligently pursued its previous discovery opportunities).

Second, the Court finds that plaintiff does not sufficiently justify delaying summary judgment and reopening discovery. For example, with respect to the defamation claim, plaintiff testified that he did not "even know if [Goswami] made any [defamatory] remarks" but "if there's smoke, there might be fire. So we'll see what discovery brings." (Pl. Dep. 196:13–15.) "The Ninth Circuit has consistently recognized that a Rule 56(d) request may be denied when the evidence sought is the object of pure speculation." *Flores-Zelaya v. Las Vegas Met. Police Dep't*, No. 13-CV-1181 (JAD), 2016 WL 697782, at *12 (D. Nev. Feb. 19, 2016) (citing *State of Cal. v. Campbell*, 138 F.3d 772, 779-80 (9th Cir. 1998) (decided under former Rule 56(f)); *Martinez v. Columbia Sportswear USA Corp.*, 553 F. App'x 760, 761 (9th Cir. 2014 (collecting authority)). Further, as noted below in the Court's analysis, while plaintiff has identified specific discoverable information with respect to the discrimination claim (qualifications of other candidates) and the retaliation claim (Goswami and Stone's communications about plaintiff), he does not adequately

8

"explain why those facts would preclude summary judgment." *Tatum*, 441 F.3d at 1100. As will be discussed, each of the claims fail due to grounds that are unrelated to the requested discovery and not disputed by plaintiff. In other words, summary judgment cannot be averted.

"In light of the lack of specificity and failure to demonstrate diligence, plaintiff['s] request under Rule 56(d) appears to be a classic example of a fishing expedition that would lead to an unjustified delay in the disposition of this case." *Zamora v. City of Oakland*, No. 12-CV-2734 (NC), 2013 WL 4103109, at *4 (N.D. Cal. Aug. 12, 2013) (citing *Keebler Co. v. Murray Bakery Prods.*, 866 F.2d 1386, 1389 (Fed. Cir. 1989) ("If all one had to do to obtain a grant of a Rule 56[(d)] motion were to allege possession by movant of 'certain information' and 'other evidence,' every summary judgment decision would have to be delayed while the non-movant goes fishing in the movant's files. . . . 'Summary judgment need not be denied merely to satisfy a litigant's speculative hope of finding some evidence [through discovery] that might tend to support a complaint.'") (citations omitted)).

Accordingly, plaintiff's Rule 56(d) request is **DENIED**, and the Court will proceed on the merits of the summary judgment motion. The Court is aware that plaintiff is proceeding pro se, but that does not excuse him from abiding by applicable deadlines.

### III. LEGAL STANDARD

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A party asserting that a fact cannot be or is genuinely disputed must support that assertion by . . . citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits, or declarations, stipulations . . . admissions, interrogatory answers, or other materials," or by "showing that materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." *Id.* 56(c)(1)(A), (B). "[W]here evidence is genuinely disputed on a particular issue—such as by conflicting testimony—that issue is inappropriate for resolution on summary judgment." *Zetwick v. County of Yolo*, 850 F.3d 436, 441 (9th Cir. 2017) (internal quotation marks omitted).

A moving party defendant bears the burden of specifying the basis for the motion and the

elements of the causes of action upon which the plaintiff will be unable to establish a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The burden then shifts to the non-moving party to establish the existence of a material fact that may affect the outcome of the case under the governing substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In the summary judgment context, the court construes all disputed facts in the light most favorable to the non-moving party. *Ellison v. Robertson*, 357 F.3d 1072, 1075 (9th Cir. 2004).

**IV. ANALYSIS**

Plaintiff alleges five causes of action: (1) wrongful termination; (2) discrimination based on age and citizenship status; (3) retaliation; (4) defamation; and (5) intentional infliction of emotional distress. The Court will consider each cause of action in turn, beginning with the discrimination claims.

**A. DISCRIMINATION (SECOND CAUSE OF ACTION)**

**1. AGE DISCRIMINATION**

Plaintiff alleges that he applied for a higher-level analytic consultant position but that defendant selected Simon Kimber, a younger employee, for the same. Plaintiff submits that defendant's failure to hire him for this position constitutes age discrimination.

Both the federal Age Discrimination in Employment Act ("ADEA") and California's Fair Employment and Housing Act ("FEHA") prohibit employers from discharging or refusing to hire an individual because of their age. 28 U.S.C. § 623(a)(1); Cal. Gov't Code § 12940(a). Claims under both the ADEA and FEHA involve the shifting of burdens articulated by the Supreme Court in *McDonell Douglas Corp. v. Green*, 411 U.S. 792, 802–05 (1973). *See Diaz v. Eagle Produce Ltd. P'ship*, 521 F.3d 1201, 1207 (9th Cir. 2008) (applying the *McDonnell Douglas* framework to a discrimination claim under the ADEA); *Guz v. Bechtal Nat'l Inc.*, 24 Cal. 4th 317, 354 (2000) ("Because of the similarity between state and federal employment discrimination laws, California courts look to pertinent federal precedent when applying our own statutes.").

First, the plaintiff bears the burden to establish a prima facie case of a violation of the ADEA and FEHA. *See McDonell Douglas Corp.*, 411 U.S. at 802; *Hawn v. Executive Jet Mgmt., Inc.*, 615 F.3d 1151, 1155 (9th Cir. 2010). In order to establish a prima facie case of age

10

discrimination under the ADEA and FEHA, plaintiff must show that he was at least 40 years old; was performing his job satisfactorily; suffered an adverse action; and was treated less favorably than a similarly situated younger employee. *See Diaz*, 521 F.3d at 1207; *Guz*, 24 Cal. 4th at 355.

If a plaintiff establishes a prima facie case, "the burden of production, but not persuasion, then shifts to the [defendant] to articulate some legitimate, nondiscriminatory reason for the challenged action." *Hawn*, 615 F.3d at 1155; *see also McDonnell Douglas Corp.*, 411 U.S. at 803. If the defendant carries this burden, the inquiry does not end. Rather, the burden shifts back to the plaintiff to demonstrate the reasons proffered by defendant are pretextual. *Id.*; *McDonnell Douglas Corp.*, 411 U.S. at 805. Consequently, the plaintiff has "the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against [him]." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000).

Defendant moves for summary judgment on the age discrimination claim on two grounds: (1) plaintiff cannot show that the advancement of more qualified candidates is pretext for discrimination; and (2) the recruiter responsible for selecting applicants for a screening interview did not know plaintiff's age. To support both contentions, defendant cites recruiter Melissa Henry's declaration testimony that she "selected the four best qualified candidates for a screening interview." (Henry Decl. at ¶ 3.) According to Henry, "Mr. Wong was not one of those four candidates as his application materials evidenced little background and experience in the area of regulatory risk at a financial services company, which was a key requirement for the open role, whereas other applicants' materials evidenced significantly more such experience." (*Id.*) In addition, Henry "did not consider Mr. Wong's or any applicant's age when [she] determined which were the best qualified candidates for the job." (*Id.*)

In opposition, plaintiff argues that "it is impossible to agree" that other better qualified candidates applied without the requested discovery. (Opp. at 12.) Indeed, plaintiff appears to challenge the recruiter's determination that the other applicants were more qualified. (Pl. Resp. to Def. Issue 2, Fact 3 ("This is the opinion of an active employee.").)

While plaintiff raises a triable issue as to pretext, the Court finds that as a matter of law, plaintiff cannot make a prima facie case where a decision-maker is unaware of the basis for the

11

alleged discrimination. *See, e.g., Robinson v. Adams*, 847 F.2d 1315, 1316 (9th Cir. 1987) (affirming summary judgment against Title VII plaintiff raising race discrimination claims where "there is no showing by direct or indirect evidence that the decision-maker knew" plaintiff was Black); *Raytheon Co. v. Hernandez*, 540 U.S. 44, 54, n.7 (2003) ("If [the employer] were truly unaware that . . . a disability existed, it would be impossible for her hiring decision to have been based, even in part, on [the employee's] disability[.]").

Here, Ms. Henry avers that she "did not know Mr. Wong's, or any other applicant's, date of birth or age when [she] selected the four candidates for a screening interview." (Henry Decl. ¶ 3.) Plaintiff does not dispute this fact. (Pl. Resp. to Def. Issue 2, Fact 4 ("Fact undisputed.").) Nor does plaintiff address this issue in his opposition brief. While plaintiff asserts in a conclusory fashion that "[b]locked discovery may reveal countervailing information" (*id.*), he fails to identify specific, discoverable facts that would tend to show Ms. Henry's awareness of his age. Because plaintiff has not raised a genuine issue of material fact as to whether the recruiter knew his age, the Court **GRANTS** the motion for summary judgment as to the age discrimination claim.

### 2. CITIZENSHIP STATUS DISCRIMINATION

Plaintiff alleges that defendant hired Sujit Nimbalker, an H1-B visa holder for another analytic consultant position. Plaintiff submits that defendant's failure to hire him for this position constitutes discrimination due to citizenship status. While the legal basis for this claim is unclear from the pleadings, plaintiff clarifies in his opposition brief that he seeks to invoke 20 C.F.R. § 655.738, which purportedly prohibits employers from displacing U.S. workers. (Opp. at 9.)

The Third Circuit provides apt context for the asserted regulation:

> The H–1B visa program is designed to allow professionals from other countries who are employed in "specialty occupations" to work in the United States on a temporary basis. 20 C.F.R. § 655.700. Employers obtain H1B visas for their employees by filing certain applications with the Department of Labor and the Department of Homeland Security. *See id.* H–1B employees either work directly for the employer who obtained the visa or are placed with other employers in need of specialty labor. . . .
>
> In order to obtain H–1B visas for their employees, employers must file a "labor condition application" ("LCA") with the Department of Labor

12

> under procedures set forth by 8 U.S.C. § 1182(n), which was incorporated into the Immigration and Nationality Act ("INA") by the Immigration Act of 1990 (the "1990 Act") and later amended by the American Competitiveness and Workforce Improvement Act of 1998 ("ACWIA"). *See* Pub.L. No. 101–649 § 205, 104 Stat. 4978, 5021–22 (1990); Pub.L. No. 105–277 § § 412–13, 112 Stat. 2681, 2981–642 to –650 (1998). As part of this application, an employer must make several attestations required by § 1182(n)(1), including that the employer will pay H–1B employees no less than the prevailing wage for that type of job; that the employer's current employees are not on strike; that the employer has notified its employees of its intent to hire H–1B workers; and that *the employer has attempted to recruit employees in the United States to fill its positions*.

*Cyberworld Enterprise Techs. Inc. v. Napolitano*, 602 F.3d 189, 192 (3rd Cir. 2010) (emphasis supplied). Thus:

> The H–1B employer is *prohibited* from placing the H–1B nonimmigrant with another employer, *unless the H–1B employer has inquired* of the other/secondary employer as to whether, *and has no knowledge that,* within the period beginning 90 days before and ending 90 days after the date of such placement, *the other/secondary employer has displaced or intends to displace a similarly-employed U.S. worker* employed by such other/secondary employer.

20 C.F.R. § 655.738(d)(5) (emphases supplied).

The Court is doubtful that the non-displacement obligation promulgated by the Department of Labor applies in this case, much less that it provides plaintiff with a cause of action for discrimination. Even assuming that 20 C.F.R. § 655.738 is somehow applicable, the Court concludes that plaintiff has not demonstrated that he suffered an adverse action. Thus, defendant's motion for summary judgment on this basis is well-taken.[5]

Generally, a nonapplicant is not entitled to relief for discrimination unless he can accomplish the "difficult task" of showing that he would have applied for a position but for

---

[5] Defendant moves for summary judgment on the citizenship status discrimination claim on several grounds: (1) to the extent plaintiff brings the claim under Section 1324b of the Immigration and Naturalization Act, he has not exhausted the required remedies for such a claim; (2) to the extent plaintiff brings the claim under Title VII or FEHA, citizenship status is not a protected category nor has plaintiff exhausted the required remedies for such a claim; and (3) plaintiff concedes that he never applied for the position for which Nimbalker was hired.

the defendant's discriminatory conduct." *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 364 (1977); *see also Pejic v. Hughes Helicopters, Inc.*, 840 F.2d 667, 673 (9th Cir. 1988) ("If [claimant] never applied, it is difficult to infer he was denied the promotions."); *Yartzoff v. Thomas*, 809 F.2d 1371, 1374 (9th Cir. 1987) ("In unusual circumstances, failure to apply for a position may not vitiate a Title VII action.") (citation omitted); *Melendez v. SAP Andina y del Caribe, C.A.*, 518 F. Supp. 2d 344, 357–58 (D.P.R. 2007) ("It is well settled that a timely application for employment for a particular vacancy or line or work is a *sine qua non* requirement for a claim of employment discrimination. Absent, as in this case, an application for employment for a particular position or vacancy, a refusal to hire discrimination claim is prone to summary adjudication and collapse.") (citing *Vélez v. Janssen Ortho, LLC,* 467 F.3d 802, 807 (1st Cir. 2006) (holding that in the absence of a job application, there cannot be a failure-to-hire case)).

Here, plaintiff "concedes that he did not know about nor apply for the position." (Opp. at 15; Pl. Resp. to Def. Issue 4, Fact 2 ("Fact not in dispute.").) Although he argues that he "probably would have applied if he had known about the opening" (Opp. at 15), plaintiff testified that he "probably wouldn't have applied for it" because the position also reported to Goswami (Pl. Dep. 179:13–17). Even assuming that he would have applied for the position, plaintiff does not claim that he "was discouraged from applying" because of discriminatory conduct." *Yartzoff*, 809 F.2d at 1374. Nor does plaintiff contend that the opening was undiscoverable. *Cf. Lockridge v. Bd. of Tr., of the Univ. of Arkansas,* 315 F.3d 1005, 1011 (8th Cir. 2003) (en banc) (noting that a plaintiff may be excused from actually applying for promotion where "the job opening was not officially posted or advertised and either . . . the plaintiff had no knowledge of the job from other sources until it was filled, or . . . the employer was aware of the plaintiff's interest in the job notwithstanding the plaintiff's failure to make a formal application") (internal emphasis omitted); *Cones v. Shalala*, 199 F.3d 512, 518 (D.C. Cir. 2000) (failure to apply for a position where employer never opened the position for competition did not defeat *prima facie* case of discrimination under Title VII).

Because plaintiff has not raised a genuine issue of material fact as to whether he suffered an adverse action, the Court **GRANTS** the motion for summary judgment as to the citizenship status

discrimination claim.[6]

### B. RETALIATION (THIRD CAUSE OF ACTION)

Retaliation claims under Title VII and the California Labor Code are also assessed under the *McDonnell Douglas* burden-shifting framework. *See McGinest v. GTE Service Corp.*, 360 F.3d 1103, 1124 (9th Cir. 2004) (applying burden-shifting framework to retaliation claim under Title VII); *Taswell v. Regents of the Univ. of Cal.*, 23 Cal. App. 5th 343, 351 (2018) (applying burden-shifting framework to retaliation claims including California Labor Code § 1102.5(b)). "If [the plaintiff] can establish a prima facie case by showing that: 1) he engaged in a protected activity; 2) he suffered an adverse employment decision; and 3) there was a causal link between the protected activity and the adverse employment decision, . . . then *McDonnell Douglas* burden-shifting is appropriate." *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1064 (9th Cir. 2002) (citations omitted). Conduct constituting a "protected activity" includes filing a charge or complaint, testifying about an employer's alleged unlawful practices, and "engaging in other activity intended to oppose an employer's discriminatory practices." *Raad v. Fairbanks N. Star Borough Sch. Dist.* 323 F.3d 1185, 1197 (9th Cir. 2003) (citing 42 U.S.C. § 2000e-39a) (internal quotation marks omitted).

Plaintiff alleges that on August 1, 2017, he had complained to Stone that Goswami, plaintiff's direct supervisor, caused him "biased and unfair treatment (discriminatory) and isolation (harassment)." (Pl. Decl. ¶ 7.) Although plaintiff requested that Stone keep their conversation in confidence, Stone told plaintiff that he had to inform Goswami of the conversation as she was his immediate supervisor. (*Id.*) On October 17, 2017, plaintiff was informed that his position had been eliminated by a reduction in force and that he would be displaced if he could not

---

[6] In opposition, plaintiff appears to assert two new theories for his failure-to-hire claim with respect to the position filled by the H1-B visa holder. First, plaintiff submits that Nimbalker is "non age protected," suggesting that plaintiff is also claiming age discrimination in this context. (Opp. at 13.) Second, plaintiff states that "[t]he terms citizenship and national origin are often used interchangeably to mean nationality" and "should the word citizenship remain problematic in Federal Court, the Plaintiff respectful[ly] request[s] leave to amend the complaint," suggesting that plaintiff is also claiming discrimination on the basis of national origin. (*Id.* at 9.) Even if the Court were to entertain these new theories, they would not be viable in light of the undisputed fact that plaintiff never applied for the position filled by Nimbalker.

15

fill another position within 60 days. Plaintiff submits that the displacement decision was made in retaliation of his complaint to Stone about Goswami.

Defendant moves for summary judgment on the retaliation claim on two grounds: (1) plaintiff admits that he did not engage in protected activity; and (2) plaintiff cannot show that the reduction in force is pretext for retaliation.

Plaintiff does not dispute that defendant eliminated 17 positions as part of a re-organization effort or that based on the standard displacement process, he was rated the lowest across five competencies against which he and his peers on the same team were measured. (Pl. Resp. to Def. Issue 6, Facts 2 and 3 ("Fact[s] not in dispute.").) Rather, plaintiff submits that the "ratings failed to account" for his work contributions and that the reduction in force was a guise in light of his "replacement" by Nimbalker's hiring. (*Id.*; Opp. at 17.)

While the fact that the ratings which led to plaintiff's displacement were completed by Goswami and Stone could raise a triable issue as to pretext, the Court finds that plaintiff cannot even make a prima facie case of retaliation where he testified that he did not report unlawful conduct:

> Q. During that meeting, you did not tell Mr. Stone that you thought Ms. Goswami was treating you differently because of your age, correct?
> A. No.
> Q. No or correct?
> A. Correct.
> Q. During that meeting, you did not tell Mr. Stone that Ms. Goswami was treating you differently because of your citizenship, correct?
> A. Correct.
> Q. During that meeting, you did not tell Mr. Stone that Ms. Goswami had violated any law, correct?
> A. Correct.
> Q. And you didn't suggest that to Mr. Stone in any way, correct?
> A. Correct.

(Pl. Dep. 191:7–22.) Because plaintiff did not "refer[ ] to *some* practice by [Goswami] that [was] allegedly unlawful, he did not engage in protected activity. *See E.E.O.C. v. Crown Zellerbach Corp.*, 720 F.2d 1008, 1013 (9th Cir. 1983).

Plaintiff appears to dispute defendant's characterization of the substance of his complaint

16

to Stone. (Pl. Resp. to Def. Issue 5, Fact 1 ("Reporting to manager constitutes protected activity.")).) Specifically, he avers that he "had a phone conversation with Mr. Sean Stone complaining about my biased and unfair treatment (discriminatory) and isolation (harassment) by my immediate supervisor, Prabalika Goswami." (Wong Decl. ¶ 7.)

While vague and lacking in detail, plaintiff's declaration testimony squarely contradicts his deposition testimony. Thus, the Court applies "[t]he general rule in the Ninth Circuit [ ] that a party cannot create an issue of fact by an affidavit contradicting his prior deposition testimony." *Kennedy v. Allied Mut. Ins. Co.*, 952 F.2d 262, 266 (9th Cir. 1991); *see also Cleveland v. Policy Mgmt. Sys. Corp.*, 526 U.S. 795, 806 (1999) (acknowledging that lower courts "have held with virtual uniformity that a party cannot create a genuine issue of fact sufficient to survive summary judgment simply by contradicting his or her own previous sworn statement . . . without explaining the contradiction or attempting to resolve disparity."). "[I]f a party who has been examined at length on deposition could raise an issue of fact simply by submitting an affidavit contradicting his own prior testimony, this would greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact." *Kennedy*, 952 F.2d at 266 (quotations and citations omitted).

Because plaintiff is not "elaborating upon, explaining or clarifying prior testimony," *Van Asdale v. Int'l Game Tech.*, 577 F.3d 989, 998–99 (9th Cir. 2009), the Court must disregard plaintiff's statement that he reported Goswami's purportedly unlawful conduct to Stone. Consequently, plaintiff has not raised a genuine issue of material fact as to whether he engaged in protected activity. The Court therefore **GRANTS** the motion for summary judgment as to the retaliation claim.

### C. DEFAMATION (FOURTH CAUSE OF ACTION)

"Defamation is an invasion of the interest in reputation. The tort involves the intentional publication of a statement of fact which is false, unprivileged, and has a natural tendency to injure or which causes special damage." *Ringler Associates Inc. v. Maryland Cas. Co.,* 80 Cal. App. 4th 1165, 1179 (2000). "Publication, which may be written or oral, is defined as a communication to some third person who understands both the defamatory meaning of the statement and its

17

1 application to the person to whom reference is made." *Id.*

2        Plaintiff alleges that he applied for an operational consultant position that was previously
3 held by colleague Devaiah Appachetolanda.  Plaintiff submits that although the recruiter "was
4 highly positive regarding [his] prosect[s] for this position" and that he went on to interview with
5 the group's director (Kamal Panda) (Pl. Decl. ¶ 5), "[n]o offer came the following week nor an
6 explanation of what had occurred" (Compl. ¶ 37).  Plaintiff speculates that "it is likely that
7 defamatory remarks were made about [him]." (*Id.*)  Specifically, plaintiff testified that he
8 "believe[s] Ms. Goswami defamed" him.  (Pl. Depo. 195:22–23.)

9        Defendant moves for summary judgment on the defamation claim on the ground that
10 "Wong admits that he has no actual knowledge or evidence that Goswami ever made any
11 defamatory remarks about him." (Motion, Dkt. No. 45, at 17.)  Specifically, plaintiff testified:

> Q.  And what statements did Ms. Goswami make that you believe were defamatory towards you?
> A.  I believe basically why I did not get that position that I had applied for might have had something to do with maybe negative remarks that she might have made about me.
> Q.  So what were those remarks?
> A.  I don't know.  I mean . . .
> Q.  You don't know whether she even made any remarks –
> A.  I don't know –
> Q.  – correct?
> A.  I don't even know if she made any remarks, correct, but – and, once again, if there's smoke, there might be fire.  So we'll see what discovery brings.

20 (Pl. Dep. 196:1–15.)

21        Plaintiff argues that he cannot respond to these arguments without the requested discovery.
22 (Opp. at 11, 18–19.)  However, while plaintiff sought Goswami's communications referencing
23 plaintiff in his discovery request, he does not allege any plausible basis upon which to conclude
24 that Goswami made defamatory statements about him.  As stated above, the Court will not permit
25 additional discovery without <u>specifically</u> identifying the sought-after facts.  Plaintiff makes no
26 such showing here.  *See*, *e.g.*, *Paddington Partners v. Bouchard*, 34 F.3d 1132, 1138 (2d Cir.
27 1994) ("A court can reject a request for discovery, even if properly and timely made through a
28 Rule [56(d)] affidavit, if it deems the request to be based on speculation as to what potentially

could be discovered."); *Painsolvers Inc. v. State Farm Mut. Auto. Ins. Co.*, 732 F. Supp. 2d 1107, 1125 (D. Haw. 2010) ("Rule [56(d)] is not a license for a fishing expedition in the hopes that one might find facts to support its claims."). Because plaintiff has not raised a genuine issue of material fact as to whether Goswami made defamatory remarks that adversely affected his employment prospects for the operational consultant position, the Court **GRANTS** the motion for summary judgment as to the defamation claim.

### D. WRONGFUL TERMINATION AND INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS (FIRST AND FIFTH CAUSES OF ACTION)

Lastly, defendant moves for summary judgment on the claims for wrongful termination in violation of public policy and intentional infliction of emotional distress, on the ground, among others, that they are derivative of plaintiff's underlying discrimination and retaliation claims. The Court agrees that the remaining claims are premised on the discrimination and retaliation claims.[7] Because plaintiff has failed to make prima facie cases of discrimination and retaliation, the Court **GRANTS** the motion for summary judgment as to the claims for wrongful termination and intentional infliction of emotional distress. *See, e.g., Merrick v. Hilton Worldwide, Inc.*, 867 F.3d 1139, 1150 (9th Cir. 2017) ("Merrick's other claims are derivative of his FEHA

---

[7] Plaintiff concedes that his "claim for the intentional infliction of emotional distress rest[ ] on his claims [of] discrimination and retaliation." (Opp. at 19.)

With respect to the wrongful termination claim, in addition to pointing to defendant's failure to hire him for the positions filled by Kember and Nimbalker, plaintiff appears to assert a brand new theory, namely, that more individuals of South East Asian (Indian) ancestry should have been displaced, not just the purported one who was part of the displacement group. (*Id.* at 7 ("[F]or a non biased displacement selection process[,] the displaced subset should contain between 3 and 6 individuals of South East Asian (Indian) ancestry. Since one or less is of South East Asian (Indian) ancestry was among the displaced, there is a strong indication within the 95% level of confidence of discrimination and biased behavior in the selection process.").) This was not pled in the complaint and cannot be raised at this stage in the proceedings.

Even if the Court were to consider the new theory as this juncture, plaintiff offers no support for this theory besides an uncorroborated "[s]tatistical analysis." (Pl. Decl. ¶ 3, Ex. A.) Moreover, plaintiff would have the Court assume that had more individuals of South East Asian descent been displaced, he would not have part of the displacement group. Plaintiff offers no evidence to warrant this assumption.

age discrimination claim, and so necessarily fail along with that claim."); *Tumblin v. USA Waste of Cal., Inc.*, No. 16-CV-2902 (DSF), 2016 WL 3922044, at *8 (C.D. Cal. July 20, 2016) (a plaintiff failing to state a claim for age discrimination under FEHA could not state a derivative claim of wrongful termination in violation of public policy).

## V. CONCLUSION

For the foregoing reasons, the motion for summary judgment is **GRANTED** in its entirety and the motion for a continuance of case-related dates is **DENIED AS MOOT**.

This Order terminates Docket Numbers 42 and 45.

The Clerk of the Court shall enter judgment for defendant.

**IT IS SO ORDERED.**

Dated: September 17, 2021

_____
**YVONNE GONZALEZ ROGERS**
**UNITED STATES DISTRICT COURT JUDGE**